# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

———————————
№ 07-CV-2662 (JFB) (WDW)
———————————

OLGA MARIA MERO,

Petitioner,

versus

ELOY ROBERTO PRIETO,

Respondent.
———————————

ORDER ADOPTING REPORT AND RECOMMENDATION
June 6, 2008
———————————

JOSEPH F. BIANCO, District Judge:

On July 2, 2007, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.*, petitioner Olga Maria Mero ("petitioner" or "Mero") petitioned the Court to order the return of Mero's minor biological daughter to Ecuador, where petitioner holds citizenship and currently resides (the "petition"). Mero's daughter, Jennifer, is eight years old and an American citizen. Aside from approximately six months in 2005, when she lived with petitioner in Ecuador, Jennifer has always lived in the United States. She presently resides in New York with her biological father, respondent Eloy Roberto Prieto ("respondent" or "Prieto"), petitioner's husband and a permanent resident of the United States.

On July 13, 2007, pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Court referred the petition to Magistrate Judge William D. Wall for an evidentiary hearing and Report and Recommendation. On March 6, 2008, after holding a two-day hearing that included testimony both from petitioner and respondent, Magistrate Judge Wall issued a thorough and well-reasoned Report and Recommendation recommending that the Court deny the petition (the "R&R"). On March 25, 2008, Mero submitted her objections to the R&R (the "R&R objections"). The R&R objections focused on the credibility of the witnesses that testified before Magistrate Judge Wall and, in particular, argued that Magistrate Judge Wall failed to consider Prieto's purported lack of credibility.[1] Although "the Second

---

[1] Petitioner also objected to Magistrate Judge Wall's application of the law to the facts. (R&R

Circuit has . . . held that [a] district judge reviewing the credibility determinations of a magistrate may defer to the judgement of the magistrate because of the magistrate's superior ability as the primary factfinder to observe witnesses and their demeanor," *Spinner v. City of New York*, No. CV-01-2715, 2003 U.S. Dist. LEXIS 14854, at *28 (E.D.N.Y. Aug. 27, 2003) (collecting cases), the Court, in its discretion – and in an abundance of caution – held an additional hearing on April 28, 2008 at which both petitioner and respondent, as well as an additional witness for petitioner, again provided testimony (the "April hearing"). For the reasons set forth below, after this additional evidentiary hearing, and after carefully reviewing *de novo* all portions of the R&R to which Mero specifically objected and the rest for clear error, the Court adopts the factual and legal findings of the R&R (with the exceptions noted herein) and agrees with and adopts Magistrate Judge Wall's overall recommendation that petitioner has failed to meet her burden of proof under the Hague Convention. Accordingly, the petition is denied.

I. FACTS

Unless otherwise noted, the facts set forth below are undisputed. The Court notes that Magistrate Judge Wall set forth a detailed description of the facts relevant to the petition in the R&R, with which the Court assumes the parties' familiarity.

A. Background

Mero and Prieto met in 1997 in Ecuador and were married there in 1998. (Transcript of April hearing ("Apr. T.")7.) Initially, Prieto lived in the United States and visited Mero two or three times per year. (Apr. T.8.)

Petitioner visited the United States for the first time in June 1998 in order to take her sick son – of whom respondent was not the biological father – to a hospital in Miami. (Apr. T.8.) Mero's son died after he and petitioner returned to Ecuador. (Apr. T.9.)

In June 1999, petitioner entered the United States through Mexico in order to live with respondent in New York. (Apr. T.10.) Petitioner gave birth to Jennifer in the United States on April 19, 2000. (Apr. T.11.) Respondent is Jennifer's biological father. (Apr. T.66.)

B. October 2004 Trip to Ecuador

In October 2004, Mero learned that she had obtained an appointment at the American Consulate in Ecuador (the "Consulate") for the purpose of receiving documentation that would enable her to reside legally in the United States. (Apr. T.14.) Along with her son, Carlos – who is not respondent's biological child – petitioner brought Jennifer from the United States to Ecuador for the appointment (the "October 2004 trip"). (Apr. T.15.)

Prieto purchased the airplane tickets for the October 2004 trip for petitioner and her children, including Jennifer. (Apr. T.15.) He purchased one-way tickets for Mero and her son, Carlos. Petitioner purchased a round-trip ticket for Jennifer. (Apr. T.15.) Jennifer's ticket indicated that she was going to return to the United States in November. (Apr. T.17.) However, Jennifer did not return at that time and the ticket expired. (Apr. T.17.)

at 2-3.)

2

Mero had an appointment at the Consulate on November 22, 2004, at which she was told to obtain additional paperwork. (Apr. T.17.) She had a second appointment on March 29, 2005, at which she was informed that she could not apply for legal residence in the United States for ten years. (Apr. T.21.)

C. April 2005 Trip to United States

After petitioner's second appointment at the Consulate, Mero agreed that Jennifer could travel to her father in New York. (Apr. T.23.) Specifically, on April 15, 2005, Mero executed papers, in accordance with Ecuadorian law, authorizing Jennifer to fly to the United States with her cousin. (*See* Petitioner's Exh. K.) An English translation of the authorization states: "She expressly authorizes her daughter the minor JENNIFER ELIANA PRIETO MERO, of United States nationality, to leave Ecuadorian territory and travel on Thursday the twenty-first of April of this year to New York City, accompanied by her cousin . . . to be reunited with her father ELOY ROBERTO PRIETO GUERRERO, a resident of the United States." (*Id.*) The authorization did not define the length of the trip. (*Id.*)

Prieto purchased Jennifer a round-trip plane ticket for the purpose of this trip. (Apr. T.23.) Jennifer traveled to the United States from Ecuador on April 21, 2005 (the "April 2005 trip") and, to date, has not returned to Ecuador. (Apr. T.24.)

The parties' central factual dispute relates to the April 2005 trip. Specifically, according to Mero, she and Prieto had agreed that the April 2005 trip was merely a vacation for Jennifer, after which she would return to live with petitioner in Ecuador. According to Prieto, he and Mero had agreed that the April 2005 trip was not a vacation, but took place for the purpose of continuing Jennifer's permanent residence in New York.

II. PROCEDURAL HISTORY

Mero filed the instant petition on July 2, 2007, and the Court held a conference that day. At that conference, in addition to ordering Prieto to surrender all of Jennifer's travel documents and other forms of identification to the Court, the Court ordered respondent not to remove Jennifer from the Court's jurisdiction during the pendency of the action. Further, as stated *supra*, the Court referred the petition to Magistrate Judge Wall on July 13, 2007 for a Report and Recommendation. On August 6, 2007, Prieto filed his response to the petition. Magistrate Judge Wall held his hearing on October 25, 2007 and October 29, 2007 (the "October hearing"). On November 16, 2007 and November 29, 2007, respectively, petitioner and respondent submitted post-trial memoranda to Magistrate Judge Wall, who issued the R&R on March 6, 2008.[2] On March 25, 2008, Mero submitted the R&R objections. After reviewing these objections and conducting a telephone conference with the parties on April 1, 2008, the Court held the April hearing,[3] at the close of which the Court afforded both parties the opportunity to make additional written submissions. Mero made such an additional submission by letter dated May 7, 2008, as did Prieto by letter dated May 19, 2008.

In conjunction with this Order Adopting

---

[2] Petitioner had also submitted a pre-trial memorandum.

[3] The Court notes that at both the October and April hearings, the witnesses testified with the aid of a Spanish interpreter.

3

Report and Recommendation, the Court has considered all of the written submissions the parties made both to the Court and to Magistrate Judge Wall. Further, in addition to conducting the April hearing, the Court has carefully reviewed the transcript of the October hearing and has taken the testimony provided at that hearing into account as well.

III. STANDARD OF REVIEW

A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. *See DeLuca v. Lord*, 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994); *Walker v. Hood*, 679 F. Supp. 372, 374 (S.D.N.Y. 1988). As to those portions of a report to which no "specific, written objection" is made, the Court may accept the findings contained therein, as long as the factual and legal bases supporting the findings are not clearly erroneous. *See* Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Greene v. WCI Holdings Corp.*, 956 F. Supp. 509, 513 (S.D.N.Y. 1997). As to those portions of a report to which specific written objections are made, the Court reviews such findings *de novo*. *See* Fed. R. Civ. P. 72(b); *Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). Thus, as stated *supra* and as set forth below, the Court has reviewed all portions of the R&R to which Mero specifically objected *de novo* and the remainder of the R&R for clear error.

IV. THE LAW OF HABITUAL RESIDENCE

In *Gitter v. Gitter*, the Second Circuit set forth the requirements of a petition brought pursuant to the Hague Convention. Specifically, the Second Circuit held:

> In order to prevail on a claim under the Hague Convention a petitioner must show that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention. The petitioner must establish these requirements by a preponderance of the evidence.

396 F.3d 124, 130-31 (2d Cir. 2005). The Second Circuit also clarified the concept of "habitual residence":

> [W]e conclude that in determining a child's habitual residence, a court should apply the following standard: First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the

conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' shared intent.

*Id.* at 134.

Further, the Second Circuit has confirmed that the "parties' shared intent is 'a question of fact to which [it] defer[s] to the district court.'" *Daunis v. Daunis*, No. 06-3518-cv, 2007 U.S. App. LEXIS 6189, at *3-*5 (2d Cir. Mar. 15, 2007) (quoting *Gitter*, 396 F.3d at 132) ("review[ing] a district court's credibility determination regarding the parent's testimony about their shared intent for clear error" and affirming district court's dismissal of Hague Convention petition). In particular, courts considering petitions under the Hague Convention have noted that

> [t]he inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case. This is especially true in cases . . . where the petitioning parent initially agreed to allow the child to stay abroad for an indefinite duration, but subsequently had second thoughts about that decision. These cases . . . generally have no clear answer and are very fact-dependent.

*Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006) (citations omitted); *see also Yang v. Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) ("A case such as this, where the petitioning parent had consented to let the child stay abroad for an undetermined period of time, is especially fact-intensive.") (citing *Mozes v. Mozes*, 239 F.3d 1067, 1077-78 (9th Cir. 2001)).

V. THE R&R

In the R&R, Magistrate Judge Wall applied the *Gitter* standard to the question of Jennifer's habitual residence prior to the April 2005 trip. Specifically, Magistrate Judge Wall held:

> The court finds it likely, based on the testimony of the parents and the other evidence, that Mero and Prieto had no fixed intention as to what they would do if Mero could not obtain papers, that the last <u>shared</u> intention as to Jennifer's habitual residence was that it would be New York, and that Mero fully intended to return to New York with Jennifer once her immigration issues were resolved. When, in late March 2005, those plans were no longer viable, Mero argues that their new shared intention was that Jennifer should become habitually resident in Ecuador, but the court finds insufficient support for that position. . . .
>
> The court cannot, on the conflicting testimony and the contradictory evidence, determine that Mero and Prieto, after the denial of

5

> Mero's visa in March 2005, intended that Jennifer's new habitual residence would be Ecuador, and Mero has not established that intent by a preponderance of the evidence.

(R&R at 6-7) (citations omitted) (emphasis in original).[4]

All of Mero's objections to the R&R relate to this holding regarding the parties' last shared intent. (*See* R&R objections at 3.) Thus, the Court has reviewed the question of intent *de novo*. As set forth below, after carefully conducting this *de novo* review, the Court concurs with Magistrate Judge Wall's primary factual conclusion. Specifically, the Court agrees that Mero failed to meet the first prong of the test in *Gitter* because she did not prove by a preponderance of the evidence that Mero's and Prieto's last shared intent was that Jennifer would reside permanently in Ecuador. Thus, as the Court also sets forth below, the Court rejects each of the R&R objections.[5]

VI. THE PARTIES' SHARED INTENT

A. Mero's and Prieto's Shared Intent at the Time of the October 2004 Trip

As set forth below, the testimonial and documentary evidence in this case demonstrates that Mero and Prieto fully expected, at the time of the October 2004 trip, that petitioner would receive permission from the Consulate to return to the United States with Jennifer. At the same time, the record fails to indicate that Jennifer's parents had made plans regarding Jennifer's residence should Mero be unable to return to the United States. The Court therefore agrees with Magistrate Judge Wall that Mero's and Prieto's shared intention at the time of the October 2004 trip was simply that Mero would return with Jennifer to reside in the United States.[6]

---

[4] Because Magistrate Judge Wall found that petitioner had failed to demonstrate the requisite intent under the first prong of the *Gitter* test, he did not reach the second or third prongs, which are related to the petitioner's custody rights. (R&R at 11.)

[5] Pursuant to *Gitter*, Magistrate Judge Wall also analyzed Jennifer's "acclimatization" to Ecuador in the course of determining her habitual residence. However, Mero did not object to Magistrate Judge Wall's holding that Jennifer had failed to meet the standard for acclimatization. Thus, the Court has reviewed this portion of the R&R for clear error and, as set forth *infra*, finds no such error. In any event, even if the Court were to review this issue *de novo*, the Court would reach the same conclusion.

[6] As a threshold matter, therefore, the Court rejects Mero's argument in the R&R objections that the parents' intent in October 2004 is irrelevant to the petition. As stated *supra*, the determination of habitual residence is a fact-intensive inquiry, and the parties' intent at the time of the October 2004 trip provides key context for the parties' intent at the time of the April 2005 trip, especially because the two trips took place less than six months apart. In any event, as the Court explains *infra*, although Magistrate Judge Wall found that the parties last shared an intent regarding Jennifer's residence at the time of the October 2004 trip, the Court finds that Mero and Prieto also shared such intent at the time of the April 2005 trip. Specifically, the Court finds that at the time of the April 2005 trip, petitioner and respondent jointly intended Jennifer to reside in the United States. Thus, petitioner's objection on the grounds that Magistrate Judge Wall should not have focused on the October 2004 trip is effectively moot.

6

(1) Testimonial Evidence

a. Prieto's Testimony

At the April hearing, Prieto explained that at the time of the October 2004 trip, he and Mero expected and intended that petitioner would succeed at the Consulate and return to live in the United States with Jennifer. In particular, respondent testified:

> Q: Did you at any time alone, or together with Ms. Mero, decide that Jennifer would remain with Ms. Mero regardless of whether or not she got her visa, her immigration papers that would allow her to live in the United States?
> A: No. At no time did we have that conversation. Because for example, before she went to Ecuador, we talked at home that we would always live here. Because we always agreed that this was a country where you had the possibilities and the comforts. And this was a place where you could offer your daughter everything. And that is why she also decided that she would send her daughter here.

(Apr. T.92.)[7] In sum, Prieto testified that he and Mero "[a]t no time" contemplated options for Jennifer's residence – other than the plan they "always" had for the family to reside together in the United States – should petitioner fail at the Consulate.

b. Mero's Testimony

Moreover, at the October hearing, Mero personally corroborated Prieto's testimony. Specifically, during petitioner's cross-examination by respondent's counsel, the following colloquy took place:

> Q: In October of 2004 when you traveled to Ecuador with Jennifer, that was for the purpose of obtaining your green card, obtaining a permanent residence status, as you earlier testified; is that

---

[7] In her written submission subsequent to the April hearing, Mero attempted to call Prieto's credibility into question by pointing out that certain of Prieto's testimony at the October hearing was inconsistent with this and other testimony at the April hearing. (*See* Respondent's Letter, dated May 7, 2008, at 6 and n.7.) As a threshold matter, and as the Second Circuit recently confirmed, "seemingly inconsistent testimony need not render a witness not credible."

*United States v. Iodice*, No. 06-2680-cr, 2008 U.S. App. LEXIS 9687, at *18 (2d Cir. May 6, 2008) ("The different details identified by Iodice do not appear to be inconsistent with each other, and to the extent that one views them as such, the District Court did not commit clear error in nonetheless crediting McCarthy's testimony.") (citing *Mathie v. Fries*, 121 F.3d 808, 811-12 (2d Cir. 1997)). Moreover, despite any purported inconsistencies with respondent's testimony in October, Prieto's testimony regarding his and Mero's intent at the time of the October 2004 trip is – as the Court sets forth *infra* – corroborated by Mero's testimony, as well as by the documentary evidence in this case. Indeed, in the course of its review, the Court has carefully considered all of the purported inconsistencies in Prieto's testimony and – in the context of the entire record, including the documentary evidence – concludes that respondent was credible in his overall assertion that he and Mero never intended Jennifer's habitual residence to be Ecuador at the time of the April 2005 trip.

7

correct?
A: Yes.
Q: And your intention at that time was to return to New York; is that correct?
A: Yes.
Q: In fact, you expected that you would be able to return to New York at that time; is that correct?
A: I thought I was going to do it, but I did not return.
Q: But at that time you believed you would return?
A: Yes.
Q: And it was your attention [sic] to return together with Jennifer?
A: Yes.
Q: And it was your intention to return together with Jennifer until you learned that your visa request had been denied; is that correct?
A: Yes.

(Transcript of October hearing ("Oct. T.")98-99.) Mero's testimony is, therefore, wholly consistent with Prieto's assertion that he and petitioner expected Mero to return with Jennifer to the United States.[8]

---

[8] The Court is aware that at the April hearing, Mero's testimony on this critical point was drastically different – even though she was asked virtually the same questions as at the October hearing. For instance, at the April hearing, the following colloquies took place during cross-examination by respondent's counsel:

> Q: And at the time you left New York to go to Ecuador for this reason, you fully expected you would be returning to New York.

(2) Additional Facts

Various facts adduced from the testimonial and documentary evidence also demonstrate that Mero and Prieto expected that petitioner and Jennifer would to return to the United States after their trip to Ecuador.

---

> Correct?
> A: I didn't know what was going to happen; was I going to get the visa or not.
>       ***
> Q: But in terms of your returning to New York, did you intend to return to New York in October 2004 when you left for Ecuador? Did you intend to return to New York?
> A: No, because I didn't know what was going to happen.

(Apr. T.47,49.)

Despite this testimony, however, Mero essentially conceded in the R&R objections that her intention at the time of the October 2004 trip was to return to the United States with Jennifer. Specifically, petitioner stated that "[a]s a factual matter, there is no dispute that Ms. Mero's intentions changed after she arrived in Ecuador" and that the "visa denial changed Ms. Mero's intent for Jennifer's habitual residence." (R&R objections, dated March 25, 2008, at 8.) By asserting that Mero's intent changed, petitioner clearly implies that she originally intended – as Magistrate Judge Wall held – to return to the United States with Jennifer. In any event, as explained *infra*, even assuming *arguendo* that Mero and Prieto did not share an intent as of October 2004, the Court's *de novo* review of the evidence reveals that the parties shared such an intent at the time of the April 2005 trip and, therefore, their intent at the time of the October 2004 trip is not dispositive under *Gitter*.

8

For instance, on October 22, 2004 – immediately prior to the October 2004 trip – Mero brought Jennifer to the pediatrician. The doctor's notes from that visit state: "Here for shots, she will be leaving tomorrow to Ecuador. To get mom green card, she will be staying 2 month." (Trial Exh. Y.) In addition, as Mero admitted at the April hearing, petitioner and respondent had "just bought" a home in New York prior to the October 2004 trip. (Apr. T.59.) Finally, Jennifer left many of her possessions behind in New York and brought only some clothes, two dolls, and a suitcase with her to Ecuador. (Apr. T.16.) In the context of the record overall, these facts support Prieto's testimony that both he and Mero intended petitioner and Jennifer to return to the United States. On the other hand, in the course of its *de novo* review, the Court has found no persuasive evidence tending to demonstrate that Mero or Prieto anticipated that the October 2004 trip could lead to Jennifer's permanent residence in Ecuador.

In sum, in light of Mero's own testimony at the October hearing and these additional facts, in the context of the overall record, the Court agrees with Magistrate Judge Wall that Mero and Prieto both expected petitioner to return to the United States with Jennifer at the time of the October 2004 trip, and that the parents did not form a shared intent regarding Jennifer's residence if Mero failed at the Consulate.

B. Mero's and Prieto's Shared Intent at the Time of the April 2005 Trip

Moreover, the Court agrees with Magistrate Judge Wall that Mero failed to prove by a preponderance of the evidence that by the time of the April 2005 trip, both she and Prieto intended Jennifer to reside in Ecuador. However, the Court further concludes that, at the time of the April 2005 trip, Mero and Prieto continued to share the intention that Jennifer reside in the United States.[9] The Court arrived at this conclusion after personally observing the testimony both of Mero and Prieto, and carefully reviewing the record *de novo* in order to determine whether either party's testimony was corroborated by the evidence. After conducting this review, and as set forth below, the Court found that the record failed to corroborate petitioner's testimony, but wholly corroborated that of respondent.

(1) The Question of Deception

As a threshold matter, the Court rejects all of Mero's arguments in the R&R based on Prieto's purported "deception" of Mero with respect to purpose of the April 2005 trip. Essentially, Mero argues that Prieto deceived her into believing that the April 2005 trip was merely a vacation, and claims that Magistrate Judge Wall found "whatever

---

[9] The Court is aware that this particular conclusion is inconsistent with Magistrate Judge Wall's finding that at the time of the April 2005 trip, "it is evident that Prieto's intent was that Jennifer return to live in the United States and that Mero's intent was that Jennifer remain with her in Ecuador. In other words, the intent of the parents diverged." (R&R at 10.) Clearly the parties' intentions with respect to Jennifer's residence are divergent at present. However, Magistrate Judge Wall did not specifically point to evidence demonstrating that at the time of the April 2005 trip, Mero intended Jennifer to live in Ecuador. In fact, as set forth *infra*, the record actually contains preponderant evidence of Mero's and Prieto's continued agreement, at the time of the April 2005 trip, that Jennifer live in the United States – including evidence, such as Jennifer's medical records, that was developed more extensively by counsel at the April hearing than at the October hearing.

9

deception" Prieto engaged in, (R&R at 10), to be "irrelevant" (R&R objections at 6). However, petitioner may have misunderstood the R&R. It is beyond cavil that both the Court and Magistrate Judge Wall are aware that a witness' deceptive behavior can bear on his credibility and should be considered on that issue. For instance, to the extent that the record of Prieto's divorce proceedings suggests that he acted deceitfully in that context, the Court has taken that evidence into account in determining respondent's credibility. Magistrate Judge Wall merely suggested that such deception would not, as Mero appears to contend, constitute intent *per se* in the context of such a fact-intensive inquiry. Further, nowhere in the R&R did Magistrate Judge Wall specifically find how respondent deceived petitioner regarding the purpose of the April 2005 trip – Magistrate Judge Wall merely referred to "whatever deception Prieto engaged in" (R&R at 10) – and this Court's review of the record reveals no such evidence. In any event, the Court has fully considered the issue of Prieto's alleged deception – as related both to respondent's credibility and to his intent for Jennifer's habitual residence – and concludes that the record does not contain credible evidence of deception in support of Mero's position.

(2) Evidence of Shared Intent

a. Prieto's Testimony

Prieto testified that his and Mero's shared intent did not change even after Mero learned that she could not return to the United States with Jennifer. Specifically, at the April hearing, respondent testified as follows, upon direct examination by his counsel:

> Q: Between the time of the first appointment when Olga discovered she had a second opportunity, and the time of the second appointment which we understand from Ms. Mero's testimony took place at the end of March; what was your understanding in terms of if and when Jennifer would be returning to the United States?
> A: Well, I always thought – I always thought, and we would always talk to each other. Well it was that if anything happened, and she was not able to get the documentation to be able to come here, then the possibility would be that Jennifer would come back to the states to be able to go to school here in the US. And then from there on we continued talking to each other. But we never talked about any other trip. There was a time when we held a conversation, and Olga said: I'm going to send Jennifer to you to the US to be with you, because she won't be learning anything here. And she is sick. She refuses to eat. She is not well. And then it was decided. She decided right then and there that we're going to send Jennifer to the US.

***

> Q: Just to clarify. Did you at any time agree that Jennifer would relocate to Ecuador

permanently?
A: No, never. Never.
Q: And when Jennifer returned in April, 2005, was it clear to you at least that she was returning permanently to the United States?
A: Yes, to New York. Yes.
Q: Did you do anything prior to that time or at that time to mislead Ms. Mero into believing that in fact Jennifer was coming here only for a short period?
A: No, no, never. We never agreed to that. I have never misled her in anything.

(Apr. T.89-90, 96.)

In addition, respondent provided consistent testimony upon cross-examination by Mero's counsel, as the following exchange reflects:

> Q: All right. Let's move on. Let's move on to March of '05, when you found out that Miss Mero's petition for US residency had been denied. Did you discuss with Miss Mero at that time where Jennifer would be located?
> A: At that time, when her visa was denied, we had not spoken for two or three days, and when we talked she wasn't feeling very good. And Jennifer wasn't feeling good, either. And that's all. That's what happened.
> Q: So did you have any discussions as to where Jennifer would be located?
> A: So I said yes. After that we discussed it and I said I want my daughter to study the language that belongs to her, English, and it would be worth it if she came back here to study.

(Apr. T.120.)[10]

---

[10] The Court has noted Mero's repeated emphasis on a particular response Prieto provided at the October hearing that, according to petitioner, not only contradicts Prieto's testimony on this point at the April hearing, but respondent's position with respect to the petition overall. Specifically, petitioner points to the following exchange during respondent's direct examination by his attorney:

> Q: But once you discovered that [Mero's] request had been denied, what did you say to her?
> A: Well, so I said, well – so I said, well, stay there. Stay there, because I have to stay here and I will always be sending you from here anything you might need. And I could always go to Ecuador to visit.

(Oct. T.166.) As Magistrate Judge Wall held, this testimony is susceptible of the interpretation that Prieto was telling Mero that she and Jennifer could remain permanently in Ecuador. However, the Court finds that this testimony is highly ambiguous and, therefore, of little probative value. On its face, the testimony does not specify whether Prieto was telling Mero alone to remain in Ecuador, or whether he was referring both to Mero and Jennifer. Moreover, Prieto's testimony immediately following this colloquy suggests that petitioner's interpretation takes respondent's remarks out of context:

> Q: And did you discuss Jennifer at that time?
> A: Well, because when three

11

### b. Documentary Evidence

As set forth below, the Court has carefully reviewed the record in this case, and concludes that the key documentary evidence corroborates Prieto's testimony.

#### 1. Travel Authorization

First, the broad, open-ended authorization Mero signed permitting Jennifer to take the April 2005 trip corroborates Prieto's testimony. Specifically, as stated *supra*, Mero authorized Jennifer to travel to the United States to be "reunited" with her father for an undefined period of time. Such a potentially limitless authorization is consistent with Prieto's testimony that Jennifer took the April 2005 trip for the purpose of continued permanent residence in the United States.[11]

> months went by, and I would call frequently because I would call every day because I wanted to know how Jennifer was doing because I love her very much, in the same way that she loves her, you understand. So she tells me that the baby doesn't feel good. She doesn't eat. She doesn't feel like eating. So it's better to send her over there [to the United States]. Over there, she has everything. . . .

(Oct. T. 166-67.) This additional testimony suggests, in keeping both with Prieto's testimony at the April hearing and the documentary evidence set forth *infra*, that Mero agreed to send Jennifer back to the United States permanently.

---

[11] The Court rejects petitioner's attempt to discount the importance of the authorization by testifying that it was merely a standard form and, therefore, that she failed to weigh the significance of the

#### 2. Medical Records

Further, the Court has carefully reviewed Jennifer's medical records, and finds that they corroborate Prieto's testimony that Mero sent Jennifer back to the United States to live because Jennifer was not feeling well. Indeed, at the April hearing, petitioner's counsel cross-examined respondent extensively regarding his claim that Mero sent Jennifer back to the United States for health reasons. However, rather than undermine Prieto's position, petitioner highlighted its credibility.[12]

---

authorization's lack of a return date to Ecuador. Even assuming *arguendo* that petitioner has testified accurately regarding her understanding of the authorization's language, the authorization still fails – at the very least – to support Mero's assertion that she and Prieto had agreed that Jennifer would reside in Ecuador. Specifically, in light of Mero's burden of proof, and given that this authorization is the sole piece of documentary evidence whose express purpose was to establish the parameters of the April 2005 trip, its failure to support Mero's version of events weighs strongly against granting the petition. Further, the Court is aware that Mero's stepfather Antonio Washington – an attorney in Ecuador – testified that he had prepared an earlier draft of the authorization with a time restriction, and that Prieto forced Washington to use the form authorization with the "not defined" language instead. (Apr. T.77, 79.) Even assuming *arguendo* that such an earlier draft would evince Mero's intention for Jennifer to return to Ecuador to live, Washington has been unable to produce a copy of this purported earlier draft and the Court finds that this testimony is unsubstantiated and unreliable in light of the entire record.

[12] Clearly, therefore, the Court rejects Mero's argument in the R&R objections that Jennifer's health was not "considered by the parties in

As a threshold matter, petitioner conceded that Jennifer was sick twice in Ecuador – even though she was there for less than six months. In particular, Mero explained that Jennifer first had "a very strong infection and fever," and that the "second time she got infection of the tonsils and fever." (Apr. T.59.)

Further, on April 28, 2005 – one week after Jennifer returned to the United States – respondent took Jennifer to the pediatrician. The doctor's notes from that visit state:

> Here w/father who reports child just returned after a 6 month stay in Ecuador w/mom but since return to USA he has noted that she has lost a lot of hair, has pale lips with dark circles under her eyes with poor appetite. . . . .
>
> Washed out, subdued, pale lips are prominent. + nearly 1lb of weight loss since last evaluated here 10/04.

(Exh. Y.) Jennifer was diagnosed with anemia. (*Id.*) Clearly, this description of Jennifer's thin and sickly appearance, as well as her diagnosis, directly support Prieto's argument that Mero sent Jennifer back to the United States for medical reasons.

Moreover, the Court rejects each of petitioner's attempts to minimize the importance of this record. For instance, the Court rejects Mero's argument that Jennifer's weight loss was too small to support Prieto's claim that Jennifer was "very thin," or to support his argument that petitioner sent Jennifer back to the United States to live for health reasons. As of April 28, 2005, Jennifer weighed only 40.5 lbs. and had dropped from the 77th percentile in weight to the 55th percentile in weight in only approximately six months. (*Id.*) In proportion to her overall weight, surely the drop in weight could have been a visible cause of concern to both of Jennifer's parents.[13] For the same reason, the Court is unpersuaded by Mero's emphasis on Jennifer's health problems prior to the October 2004 trip; even if Jennifer were experiencing other symptoms prior to her trip to Ecuador, the loss in Jennifer's weight – coupled with the other signs of anemia – could have appeared to be a new symptom warranting residence in the United States. Finally, the Court rejects petitioner's argument that Mero would not have sent Jennifer to the United States for a problem as easily remedied as anemia. Petitioner has

---

forming their intent in April 2005." (R&R objections at 3.) In fact, the Court notes that one of Mero's primary arguments underlying the petition actually corroborates the fact that Jennifer's health was a crucial consideration. In particular, petitioner repeatedly argues that she would never have intentionally sent Jennifer to live in the United States after the death of her son. However, her son died of an illness in Ecuador. Thus, her son's death could just as easily have been a factor strongly militating in favor of sending Jennifer to the United States for medical care.

[13] The Court notes that it does not assess herein that this weight loss was – or was not – medically significant. Rather, the relevant inquiry is whether Mero, as Prieto asserts, intentionally sent Jennifer to reside in the United States for health reasons. Thus, the Court merely holds that Jennifer's sickly appearance – as substantiated by the medical records described above ("Washed out, subdued, pale lips are prominent. + nearly 1lb of weight loss since last evaluated here 10/04") – supports this assertion.

13

provided no evidence that she knew Jennifer had anemia, and not a more serious problem. Thus, Mero could not have known with any certainty that Jennifer's health problems could be easily solved.

In sum, the Court finds that Prieto's testimony that Mero intentionally sent Jennifer to reside in the United States was fully supported by the key documentary evidence in the case, including the travel authorization Mero executed and Jennifer's medical records.[14]

### (3) Mero's Unsupported Testimony

In stark contrast to Prieto's assertions, which are supported by the record, the Court has reviewed Mero's testimony indicating that both she and Prieto intended for Jennifer to reside in Ecuador at the time of the April 2005 trip, and finds that petitioner's testimony is wholly uncorroborated and not credible. As set forth below, Mero has failed to meet her burden to demonstrate shared intent by a preponderance of the evidence.[15]

In attempting to meet her burden to show that her last shared intent with Prieto prior to the April 2005 trip was for Jennifer to live in Ecuador, Mero repeatedly testified, in essence, that she and Prieto "had always agreed that the daughter, that a daughter should always be with her mother, especially because she is a female. And we always agreed, and we repeated, that the child would always be with me, with the mother." (Apr. T.25.) According to Mero, she operated under this assumption until after the April

---

[14] The Court has considered the remaining pieces of documentary evidence in this case – the round-trip tickets Prieto bought Jennifer both for the October 2004 and April 2005 trips – and finds that the tickets are not probative of either party's account of events. Mero claims that Prieto purchased a round-trip ticket for the October 2004 trip merely because it was cheaper (Apr. T.15-16), and Prieto claims that he purchased a round-trip ticket for the April 2005 trip for the same reason (Apr. T.95.) Thus, even assuming *arguendo* that the Court may infer Prieto's intentions with respect to Jennifer's residence from his purchasing her a round-trip ticket for the October 2004 trip to Ecuador, the Court makes an analogous inference from his purchasing her a round-trip ticket for the April 2005 trip to the United States – and applies the same financial caveat to each purchase. Because the Court finds that the evidence suggests that the round-trip tickets were (or could have been) utilized on these occasions simply because they were cheaper than one-way tickets, the Court also finds that the tickets are not dispositive (or even highly probative) of the intent of the parties at the time. Instead, the Court finds the above-referenced testimony and evidence to be much more compelling evidence of intent.

[15] In particular, the sole piece of evidence Mero proffers in support of the petition – other than her own, uncorroborated testimony and the fact that her son had died – is her status as Jennifer's primary caretaker. Indeed, petitioner objects to the R&R on the grounds that Magistrate Judge Wall did not take this status into account in analyzing the parties' shared intent, but merely in analyzing Jennifer's acclimatization to Ecuador. As a threshold matter, the Court has carefully reviewed the R&R, and nowhere does it indicate that Magistrate Judge Wall failed to consider Mero's status as Jennifer's caretaker in analyzing the intent issue. In any event, the Court agrees with petitioner that this status is relevant, and has taken it into account in its *de novo* review of the question of shared intent. However, in light of the significant evidence demonstrating that Mero and Prieto intended Jennifer to reside in the United States at the time of the April 2005 trip, discussed *supra*, the simple fact that petitioner was Jennifer's caretaker is insufficient for Mero to meet her burden of proof.

2005 trip, when respondent stated his intention not to return Jennifer to Ecuador. (Apr. T.60.) The Court has carefully reviewed the record for evidence that corroborates petitioner's testimony on this crucial issue. However, the Court has been unable to find any evidence – persuasive or otherwise – that supports Mero's account of events. Indeed, as set forth below, the Court finds that the record contradicts petitioner's testimony with respect to a crucial point.

Specifically, the petition suggests that Prieto informed Mero in June 2005 that he was not going to return Jennifer to Ecuador. (Petition ¶ 25.) However, during counsel for respondent's cross-examination of Mero at the April hearing, petitioner provided vastly contradictory dates of this key conversation. First, Mero stated that she did not learn about Prieto's plan until July 31, 2005. (Apr. T.60.)[16] Subsequently, she stated that she did not learn of this plan until September 2005. (Apr. T.61.) When respondent's counsel pointed out these contradictions, Mero then testified: "Well, he said that [Mero would not see Jennifer again] in June, but then we continued talking to each other and things were so-so, and later in September is when he finally told me that it was final that I would never see Jennifer again." (Apr. T.64.) Given the grave importance of this alleged conversation to Mero's version of events – and in light of petitioner's failure to point to any evidence to corroborate that this conversation occurred at all – such inconsistency and imprecision in petitioner's testimony profoundly undermines petitioner's efforts to meet her burden of proof.[17]

In sum, after carefully conducting a *de novo* review of the question of the parties' last shared intent, the Court concludes that Mero and Prieto's shared intent – immediately before the April 2005 trip – was for Jennifer to reside permanently in the United States.

C. Acclimatization

As stated *supra*, although "[n]ormally the shared intent of the parents should control the habitual residence of the child," a court should also "inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual

---

[16] Mero's claim that she learned on July 31, 2005 about Prieto's purported plan never to return Jennifer is especially dubious in light of the fact that, according to petitioner, respondent visited petitioner for fifteen days at that time and they had a "very good" visit. (Apr. T.25.)

[17] The Court is aware of an additional factual dispute between petitioner and respondent regarding his alleged attempts to limit Mero's communication with Jennifer since the April 2005 trip. Clearly any breakdown in communication between Jennifer and her mother is disconcerting to the Court. As a threshold matter, however, the record does not clearly demonstrate that Prieto is responsible for such a breakdown. In particular, although Mero contends that Prieto changed his phone numbers in order to elude contact with Mero, petitioner admitted at the April hearing that she has never written to Jennifer in the United States, even though petitioner knew the address where Jennifer lived. (Apr. T.69.) Indeed, Jennifer's failure even to receive presents or birthday cards from her mother, (Apr. T.97), belies petitioner's claim that she was attempting to stay in contact with her daughter. In any event, even if the lack of contact is respondent's fault, this fact would not alter the Court's factual and legal conclusions regarding the key issue in this case: the parties' intent at the time of the April 2005 trip.

15

residence, notwithstanding any conflict with the parents' shared intent." *Gitter*, 396 F.3d at 134. Here, Magistrate Judge Wall conducted this requisite analysis regarding acclimatization, and held that

> although the evidence suggests that Jennifer lived comfortably in Ecuador with her mother for six months, it does not point "**unequivocally** to the conclusion that the child has become acclimatized to [her] new surroundings and that [her] habitual residence has consequently shifted." *Gitter*, 396 F.3d at 133 (emphasis added).

(R&R at 9.) As the Court also stated *supra*, because Mero did not specifically object to this holding, the Court has reviewed it for clear error, and concludes that Magistrate Judge Wall did not so err. In any event, even under a *de novo* standard of review, the Court reaches the same conclusion. Specifically, the Court agrees with Magistrate Judge Wall that the following factors, taken together in the context of the entire record, demonstrate Jennifer's failure to acclimatize under *Gitter*: (1) Jennifer lived in Ecuador for less than six months; (2) Jennifer was very young during her visit to Ecuador; (3) Jennifer did not attend school in Ecuador, although she attended school in the United States both before and after her trip to Ecuador;[18] and (4) Jennifer had left many of her possessions behind in New York and brought only some clothes, two dolls, and a suitcase with her to Ecuador (Apr. T.16).[19]

---

[18] Mero claims that she could not send Jennifer to school in Ecuador because Prieto had lost Jennifer's birth certificate. However, even assuming *arguendo* that petitioner's testimony is accurate, Prieto's losing the birth certificate does not justify Mero's failure to enroll Jennifer in school: Mero was able to procure a copy of Jennifer's birth certificate in order to initate the instant litigation. (Apr. T.30.)

[19] The Court notes that pursuant to Article 12 of the Hague Convention, if a court determines that a child has been wrongfully retained, but the petition is filed more than one year after the date of the wrongful retention, the Court must order the child's return "unless it is demonstrated that the child is now settled in its new environment." *Matovski v. Matovski*, No. 06 Civ. 4259, 2007 U.S. Dist. LEXIS 65519, at *22 (S.D.N.Y. Sept. 4, 2007) (quoting Hague Convention art. 12). Here, Mero did not file the petition until over two years after the date of Jennifer's purportedly wrongful retention (April 21, 2005). As a threshold matter, although petitioner argues that the Court should apply the doctrine of equitable tolling to prevent the application of Article 12 in this case, (*see* Petitioner's Post-Trial Memorandum of Law at 29), some courts have found that equitable tolling does not apply in this context. *See, e.g., Matovski*, 2007 U.S. Dist. LEXIS 65519, at *35 ("Because the denial of a petition pursuant to Article 12 is discretionary, equitable tolling is unnecessary to deter an abductor from concealing the whereabouts of a wrongfully removed or retained child. Equitable tolling would be inconsistent with the Convention's careful balancing of interests and this Court concludes it has no application to Article 12."). Nevertheless, even assuming *arguendo* that equitable tolling does apply, the Court finds that petitioner was not diligent during the lengthy period of time between the date of the allegedly wrongful retention and the date the petition was filed. For instance, Mero did not attempt to obtain a copy of Jennifer's birth certificate, which is a prerequisite for beginning litigation related to Jennifer's retention in the United States, until October 2005 – approximately six months after the April 2005 trip. (Petitioner's Post-Trial Memorandum of Law at 30.) As stated *supra*, petitioner has

16

## VII. CONCLUSION

For the foregoing reasons, after reviewing those portions of the R&R to which petitioner objected specifically *de novo* and the remainder for clear error, the Court adopts the factual and legal findings of the R&R (with the exceptions noted herein) and agrees with and adopts Magistrate Judge Wall's overall recommendation that petitioner has failed to meet her burden of proof under the Hague Convention. Accordingly, the petition is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 6, 2008
Central Islip, New York

\* \* \*

The attorneys for petitioner are David A. Bergan, Esq. and Mychii Snape, Esq. of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York, 10036. The attorney for respondent is Neil J. Saltzman, Esq., 230 Park Avenue, New York, New York, 10169.

---

provided inconsistent testimony regarding the time at which she purportedly learned that Prieto did not intend to return Jennifer. However, the petition states that Mero learned of this intention in June 2005 (four months prior to Mero's attempt to obtain the birth certificate), and petitioner testified that although it was not "final," Prieto informed her on July 31, 2005 that he did not intend to return Jennifer (three months prior to Mero's attempt to obtain the birth certificate). Under these circumstances, the Court finds that any alleged ambiguity in respondent's intentions does not justify the delay in obtaining the birth certificate and, therefore, equitable tolling is unwarranted. In any event, in applying Article 12 to this case, and assuming *arguendo* that the retention was wrongful – which it was not – the Court would not be required to order Jennifer's return to Ecuador if she were well-settled here. In fact, the evidence shows indisputably that Jennifer is extremely well-settled with her father. Specifically, in the years that she has lived in the United States since the April 2005 trip, Jennifer has been healthy (Apr. T.87), attends school and church (Apr. T.95), and participates in organized after-school activities (Apr. T.95). Thus, Article 12 provides an independent grounds for rejecting the petition.

17